## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MOHAMMED S., et al., | Case No. 20-cv-793 (NEB/ECW) |
| Petitioners, | |
| v. | **REPORT AND RECOMMENDATION** |
| LESLIE TRITTEN, in her official capacity as Field Office Director, Minnesota Field Office of U.S. Immigration & Customs Enforcement; MATTHEW T. ALBENCE, Deputy Director and Senior Official Performing the Duties of the Director of the U.S. Immigration and Customs Enforcement; US. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD WOLF, in his official capacity as Acting Secretary, U.S. Department of Homeland Security; WILLIAM P. BARR, in his official capacity as Attorney General, U.S. Department of Justice; and JOEL BROTT, in his official capacity as Sheriff, Sherburne County, | |
| Respondents. | |

---

This matter is before the Court on Petitioners' Motion for Temporary Restraining Order or Preliminary Injunction (Dkt. 43) ("Motion").  Petitioners move pursuant to Federal Rule of Civil Procedure 65(a) and (b) for a temporary restraining order ("TRO") or, in the alternative, for a preliminary injunction requiring Respondents to release Petitioners from their present detention at the Sherburne County Jail to their homes under such individually appropriate terms and conditions as will reasonably assure their future

appearance in any immigration proceeding.  The case has been referred to the

undersigned United States Magistrate Judge for a report and recommendation pursuant to

28 U.S.C. § 636 and Local Rule 72.1.  A hearing on the Motion was held on April 22,

2020.  Frederick J. Goetz, appointed pursuant to 18 U.S.C. § 3006A, appeared on behalf

of Petitioners.  David Fuller, Assistant United States Attorney, appeared on behalf of

Respondent The U.S. Immigration & Customs Enforcement ("ICE" or "Federal

Respondent").  Timothy Sime, Sherburne County Attorney's Office, appeared on behalf

of Joel Brott, in his official capacity as Sheriff, Sherburne County ("County

Respondent").  William E. Manske appeared on behalf of Amicus, The Advocates for

Human Rights.  Final written submissions from the parties were completed on April 24,

2020.  For the reasons discussed below, the Court recommends that the Motion be denied

without prejudice.

## I.      BACKGROUND

**A.      The COVID-19 Pandemic**

COVID-19, the disease caused by the novel coronavirus SARS-CoV-2, was first

reported in Wuhan, China in December 2019.  (Dkt. 46-1 ¶ 6.)  As of April 7, 2020,

COVID-19 has become a global pandemic with at least 1,360,039 cases and 75,972

deaths reported in 183 countries.  (Dkt. 46-1 ¶ 7.)  As of April 7, 2020, there were

368,289 cases and 10,989 deaths attributed to COVID-19 in the United States, and

Minnesota had 986 confirmed cases with 29 deaths due to the pathogen.  (Dkt. 46-1 ¶ 7.)

Within a week, Minnesota saw an increase to 1,809 confirmed cases of COVID-19 and

87 deaths.  *See* MN Dept. of Health, *Situation Update for Coronavirus Disease 2019*

*(COVID-19)*, (last visited April 15, 2019), https://www.health.state.mn.us/diseases/ coronavirus/situation.html.  Of the total Minnesota cases, 445 required hospitalization. (*Id.*)  Sherburne County had had 11 positive cases with no deaths.  *Id.* (see cases by County of Residence).  Researchers have recently concluded that "[i]f a county has detected only one case of COVID-19, there is a 51% chance that there is already a growing outbreak underway."  (Dkt. 46-3 at 2.)  As of the date of this Report and Recommendation, there are 4,181 confirmed positive cases with 301 deaths in Minnesota, and Sherburne County has 19 confirmed cases with no deaths.  MN Dept. of Health, *Situation Update for Coronavirus Disease 2019 (COVID-19)*, (last visited April 28, 2019), https://www.health.state.mn.us/diseases/coronavirus/ situation.html.

Individuals infected with COVID-19 exhibit a range of symptoms including those with no illness at all (asymptomatic COVID-19) to those with a debilitating chronic cough, shortness of breath, fever, and fatigue.  (Dkt. 46-1 ¶ 11.)  Pneumonia is the major cause of death.  (Dkt. 46-1 ¶ 7.)  A patient may suffer from these symptoms for a matter of days to several weeks.  (Dkt. 46-1 ¶ 11.)  When the lungs are involved (pneumonia), management may necessitate transfer to intensive care with intubation and supplemental oxygen.  (Dkt. 46-1 ¶ 11.)  Those requiring intensive care are at greatest risk of dying. (Dkt. 46-1 ¶ 11.)  There is currently no vaccine nor valid medical therapy other than supportive care for the treatment COVID-19 infections.  (Dkt. 46-1 ¶ 8.)

According to Petitioners' expert, Phillip K. Peterson, M.D., a Board Certified Internist and Infectious Diseases Specialist, individuals with the following conditions are at risk for severe illness or death if they contract COVID-19:

- Moderate to severe asthma;

- Chronic heart disease;

- Lung disease;

- Liver disease;

- Chronic kidney disease and those who are undergoing dialysis;

- Hypertension (high blood pressure);

- Anxiety disorder;

- Diabetes;

- Severe obesity;

- Autoimmune deficiencies and conditions that can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation;

- Individuals over 60 years old; and/or

- Individuals who are under chronic stress, which is known to impair immunity and increase risk of infection, theoretically including severe COVID-19.

(Dkt. 46-1 ¶ 10.)

According to The Centers for Disease Control and Prevention ("the CDC"), based on available information, individuals with the following conditions or living in the following circumstances are at high risk for severe illness from COVID-19:

- People 65 years and older;

- People who live in a nursing home or long-term care facility;

- People of all ages with underlying medical conditions, particularly if not well controlled, including:

    o People with chronic lung disease or moderate to severe asthma;

4

- ○ People who have serious heart conditions;

- ○ People who are immunocompromised, where many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications;

- ○ People with severe obesity (body mass index ("BMI") of 40 or higher);

- ○ People with diabetes;

- ○ People with chronic kidney disease undergoing dialysis; and

- ○ People with liver disease.

*See* Ctrs. for Disease Control & Prevention, *People Who Are at Higher Risk for Severe Illness* (last visited Apr. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

COVID-19 is transmitted person-to-person by respiratory droplets or by touching contaminated surfaces.  (Dkt. 46-1 ¶ 7.)  One of the major challenges in stopping the spread of COVID-19 is that people with no symptoms can spread the virus to others. (Dkt. 46-1 ¶ 7; Dkt. 69-2 ¶ 4.)[1]  Indeed, Federal Respondent, relying on the CDC, acknowledges that "[t]here is also evidence of asymptomatic transmission, in which an individual infected with COVID-19 is capable of spreading the virus to others before

---

[1]     Federal Respondent argues that the declarations and evidence attached to the Second and Third Affidavits of Fredrick J. Goetz (Dkts. 69 and 70) should be stricken because affidavits and declarations are not allowed on reply under Rule 6 of the Federal Rules of Civil Procedure.  This Court disagrees, given that the Local Rules of this District contemplate such pleadings to the extent they are responsive to an opposition, as set forth in the advisory comments to Local Rule 7.1 (1999 Comments), and on the basis that the Court gave Respondents an opportunity to respond to this evidence.

exhibiting symptoms."  U.S. Imm., and Customs Enforc. ERO *COVID-19 Pandemic*

*Response Requirements* (Version 1.0, April 10, 2020), (last visited April 27, 2020),

https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

"Thus, it is imperative to keep people separated from each other (sheltering-in-place) and

to eliminate, as far as possible, congregate living circumstances."  (Dkt. 46-1 ¶ 9.)  The

CDC has recommended that "[m]aintaining good social distance (about 6 feet) is very

important in preventing the spread of COVID-19."  *See* Ctrs. for Disease Control &

Prevention, *How COVID-19 Spreads,* https://www.cdc.gov/coronavirus/2019-ncov/

prevent-getting-sick/how-covid-spreads.html (last visited Apr. 27, 2020).  Petitioners'

expert Dr. Peterson opined that distancing of 6 feet at all times is essential, and that it is

now apparent that this may likely be inadequate because fine aerosols from asymptomatic

people due to just breathing or talking can travel farther and infect surfaces that others

could touch.  (Dkt. 69-3 ¶ 5.)  This is the rationale for the recent announcement by the

CDC that people wear face masks where others are present.  (Dkt. 69-3 ¶ 5.)

On March 13, 2020, Minnesota Governor Tim Walz issued Executive Order 20-01

declaring a peacetime emergency as a result of the COVID-19 pandemic.  (Dkt. 46-5 at

1.)  On March 15, 2020, Governor Walz issued Executive Order 20-02 ordering the

temporary closure of public schools.  (Dkt. 46-5 at 1.)  On March 25, 2020, Governor

Walz issued Executive Order 20-20, which directed Minnesotans to stay at home except

for certain excepted activities and essential work.  (Dkt. 46-5 at 1.)  On April 8, 2020,

Governor Walz issued Emergency Executive Order 20-33 extending the stay-at-home

order and temporary closure of bars, restaurants, and other places of public

accommodation until May 4, 2020.  (Dkt. 46-5 at 2-3.)

**B.     ICE**

There have been 317 confirmed cases of COVID-19 among those in ICE custody

throughout the United States.  *See* U.S. Imm., and Customs Enforc., *ICE Guidance on*

*COVID-19* (last visited April 27, 2020), https://www.ice.gov/coronavirus.

The CDC has recognized that because detention centers integrate custody,

housing, education, recreation, healthcare, food service, and workplace components in a

single physical setting, they present unique challenges for the control of COVID-19.

(Dkt. 46-19 at 2.)  With respect to preventing the introduction and spread of COVID-19

in detention facilities, the CDC recommends that a number of steps be taken at such

facilities including: restricting or suspending the transfers of detained persons and to

subject any transfers to medical isolation to evaluate if COVID-19 testing is appropriate;

quarantining all new inmates for 14 days before they enter into the general population;

cleaning and disinfecting surfaces that are frequently touched multiple times per day,

including the use of disinfectants effective against the virus; increasing the number of

staff or detained persons trained and responsible for cleaning the common areas to

ensure cleaning of the areas throughout the day; providing detainees, at no cost, with

soap, running water, and hand drying machines or paper towels; implementing social

distancing strategies to increase the physical space between each detained person,

ideally 6 feet between all individuals, which should include staggering meal and

recreation times, and reassigning for bunking; and medically isolating confirmed or

suspected COVID-19 cases.[2]  (Dkt. 46-19 at 9-11, 14-15.)  With respect to staff, the CDC recommends that staff stay home if they are sick and perform daily temperature checks for staff.  (Dkt. 46-18 at 12.)

In addition, ICE's Enforcement and Removal Operations ("ERO") has issued COVID-19 Pandemic Response Requirements, which requires non-dedicated ICE detention facilities to comply with the CDC's interim guidance.  *See* U.S. Imm., and Customs Enforc. ERO *COVID-19 Pandemic Response Requirements* (Version 1.0, April 10, 2020), (last visited April 27, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsClean Facilities.pdf. ERO requirements also provide that cloth face coverings should be worn by detainees and staff.  (*Id.*)  Similar to CDC guidelines, detention facilities are to provide detainees and staff with no-cost, unlimited access to supplies for hand cleansing, including liquid soap, running water, hand drying machines or disposable paper towels, and no-touch trash receptacles.  (*Id.*)  Screening should take place before staff and new intakes enter the facility (or just inside the facility), including visual and temperature checks.  (*Id.*) As it relates to social distancing, ERO recommends efforts at reducing facility

---

[2]      The CDC explains the difference between a "confirmed" and "suspected" case of COVID-19 as follows: "Confirmed vs. Suspected COVID-19 case—A confirmed case has received a positive result from a COVID-19 laboratory test, with or without symptoms.  A suspected case shows symptoms of COVID-19 but either has not been tested or is awaiting test results.  If test results are positive, a suspected case becomes a confirmed case."  *See* Ctrs. for Disease Control & Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (last visited Apr. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

population to 75% of capacity, housing detainees in individual rooms to the extent possible, staggering access to recreation and mealtimes, avoiding congregating in groups of ten or more, and maintaining a distance of six feet.  (*Id.*)

In March 2020, ERO convened a working group between medical professionals, disease control specialists, detention experts, and field operators to identify additional enhanced steps to minimize the spread of the virus.  (*Id.*)  ICE has "since evaluated its detained population based upon the CDC's guidance for people who might be at higher risk for severe illness as a result of COVID-19 to determine whether continued detention was appropriate."  (*Id.*)  Based on this, ICE has taken the following actions:

> ICE has released nearly 700 individuals after evaluating their immigration history, criminal record, potential threat to public safety, flight risk, and national security concerns.  This same methodology is currently being applied to other potentially vulnerable populations currently in custody and while making custody determinations for all new arrests. Additionally, ERO has limited the intake of new detainees being introduced into the ICE detention system.  ICE's detained population has dropped by more than 4,000 individuals since March 1, 2020 with a more than 60 percent decrease in book-ins when compared to this time last year.

(*Id.*)

On April 8, 2020, the ERO issued updated internal guidance with respect to reviewing the detention of individuals in light of the COVID-19 pandemic.  (Dkt. 59-1.) The guidance included the following:

> The Centers for Disease Control and Prevention (CDC) has developed a list of categories of individuals identified as potentially being at higher-risk for serious illness from COVID-19.  Expanding on that list, ERO has identified the following categories of cases that should be reviewed to re-assess custody:
>
> • Pregnant detainees or those having delivered in the last two weeks

- Detainees over 60 years old

- Detainees of any age having chronic illnesses which would make them immune-compromised, including but not limited to:

  o Blood Disorders

  o Chronic Kidney Disease

  o Compromised immune system (e.g., ongoing treatment such as chemotherapy or radiation, received an organ or bone marrow transplant, taking high doses of corticosteroids or other immunosuppressant medications)

  o Endocrine disorders

  o Metabolic disorders

  o Heart disease

  o Lung Disease

  o Neurological and neurologic and neurodevelopment conditions.

* * *

After identifying a case as meeting any of the above criteria, you should review the case to determine whether continued detention remains appropriate in light of the COVID-19 pandemic.

The presence of one of the factors listed above should be considered a significant discretionary factor weighing in favor of release. To be clear, however, it may not always be determinative. Field offices must remain cognizant of the requirements of mandatory detention. Section 236(c) of the Immigration and Nationality Act (INA) mandates the detention of certain categories of criminal and terrorist aliens during the pendency of removal proceedings. Such aliens may not be released in the exercise of discretion during the pendency of removal proceedings even if potentially higher-risk for serious illness from COVID-19. INA § 236(c); 8 C.F.R. § 236.1(c)(1)(i). Such aliens may only be released following a final order issued by an immigration judge, the Board of Immigration Appeals, or a federal court granting the alien relief, dismissing proceedings, or terminating proceedings. Similarly, pursuant to section 241(a)(2), certain criminal and terrorist aliens subject to a final order of removal may not be released during the 90-day

removal period even if potentially higher-risk for serious illness from COVID-19. INA § 241(a)(2). For alien's [sic] subject to discretionary detention under section 236(a), please remember that release is prohibited, even if the alien is potentially higher-risk for serious illness from COVID-19, if such release would pose a danger to property or persons. 8 C.F.R. § 236.1(c)(8).

(Dkt. 59-1.)

During the COVID-19 pandemic in recent weeks, Immigration Health Service Corp ("IHSC") has repeatedly provided the Sherburne County Jail ("SCJ") with updated information from IHSC's Public Health Safety Preparedness Unit, which collaborates with the CDC and State public health agencies to track and monitor infectious diseases, concerning best practices to maximize the safety of inmates, staff, and immigration detainees. (Dkt. 59 ¶ 7.)

## C.    Petitioners' Backgrounds

The Amended Petition divides the Petitioners, who are ICE detainees, into two groups: (1) Petitioners who are "at a high risk for severe illness or death" if they contract COVID-19; and (2) Petitioners generally at risk. Federal Respondent has provided some information regarding the Petitioners' documented health problems, the statute under which they are detained, any ICE assessment pertaining to their release, their status at the SCJ, their purported risk to the community, and their risk of flight.

### 1.     Petitioners with Alleged Increased Risk Factors

Petitioner Mohammed S. is a 58-year-old citizen of India who has been detained by ICE at the SCJ for thirteen months.  (Dkt. 19 ¶ 1.)[3]  He claims to suffer from ischemic heart disease, hypertension, diabetes, osteoarthritis, and prostate malignancy.  (Dkt. 19 ¶ 1.)  He claims no history of convictions for crimes of violence and has lived in the United States for thirty years.  (Dkt. 19 ¶ 1.)  Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19.  (Dkt. 59 ¶ 17; Dkt. 60.)  Mohammed S. is being held in custody pending removal pursuant to 8 U.S.C. § 1226(c).  (Dkt. 59 ¶ 11.)  An immigration judge denied this Petitioner bond due to danger to the community related to fraud and flight risk.  (Dkt. 59 ¶ 17; Dkt. 82.)

Petitioner Abdihaijur S. is a 40-year-old citizen of Somalia who had been detained by ICE at the SCJ since approximately December 2019.  (Dkt. 19 ¶ 2.)  This Petitioner has been released from custody since the filing of the Amended Petition upon being granted relief from removal.  (Dkt. 75.)

Petitioner Abdirahman A. is a 47-year-old citizen of Somalia who has been detained by ICE at the SCJ for sixteen months.  (Dkt. 19 ¶ 3.)  He claims to suffer from depression and anxiety, which has worsened since he entered the SCJ.  (Dkt. 19 ¶ 3.)  Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19 due to reasons unrelated to his mental health.  (Dkt. 59 ¶ 16; Dkt. 60.)  This

---

[3]     With respect to the information regarding the Petitioners from the Amended Petition, the paragraph numbering corresponds to the "PARTIES" section of the Amended Petition.

Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231 and is within the 90-day mandatory detention period. (Dkt. 59 ¶¶ 12, 17.)

Petitioner Amged O. has been released from custody for unspecified reasons. (Dkt. 59 ¶ 20.)

Petitioner Balde M. is a 19-year-old man who has been detained by ICE at the SCJ for twelve months. (Dkt. 19 ¶ 5.) He claims to suffer from anxiety and depression. (Dkt. 19 ¶ 5.) There are no verified medical diagnoses for these conditions. (Dkt. 60.) This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231. (Dkt. 59 ¶ 12.) He has no history of violent crimes and has lived in the United States for three years. (Dkt. 19 ¶ 5.)

Petitioner Blama K. is a citizen of Liberia who has been detained by ICE at the SCJ for ten months. (Dkt. 19 ¶ 6.) He claims to suffer from shortness of breath each morning, anxiety, and depression. (Dkt. 19 ¶ 6.) There are no verified medical diagnoses relating to his shortness of breath. (Dkt. 60.) He claims he has no felony convictions for crimes of violence and has lived in the United States for fifteen years. (Dkt. 19 ¶ 6.) This Petitioner is being held in custody pending removal pursuant to 8 U.S.C. § 1226(c). (Dkt. 59 ¶ 11.)

Petitioner Boucka M. is a 20-year-old man who has been detained by ICE at the SCJ for seven months. (Dkt. 19 ¶ 7.) He claims to suffer from heart disease and hypertension, as well as schizophrenia. (Dkt. 19 ¶ 7.) Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19. (Dkt. 59 ¶ 16; Dkt. 60.) This Petitioner is being detained as an arriving alien pursuant to 8 U.S.C. § 1225. (Dkt. 59 ¶

13.)  He claims he has no criminal history and has lived in the United States for one year. (Dkt. 19 ¶ 7.)  The ICE Field Office Director Jeffrey L. Field determined that release is not warranted for this Petitioner because he presents a danger to the community, including because he allegedly exposed himself to a woman on a flight to the United States.  (Dkt. 59 ¶ 18.)

Petitioner Daud S.D. is a 49-year-old man who has been detained by ICE at the SCJ for eleven months. (Dkt. 19 ¶ 8.)  He claims to suffer from heart disease, hypertension, and diabetes.  (Dkt. 19 ¶ 8.)  Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19.  (Dkt. 59 ¶ 16; Dkt. 60.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231.  (Dkt. 59 ¶ 12.)  He has no history of convictions for a crime of violence and has lived in the United States for two years.  (Dkt. 19 ¶ 8.)  The ICE Field Office Director has determined that release is not warranted due to his failure to comply and his flight risk. (Dkt. 59 ¶ 18.)

Petitioner Emad A.R. is a 51-year-old citizen of Jordan who has been detained by ICE at the SCJ for twelve months.  (Dkt. 19 ¶ 9.)  He claims to suffer from diabetes, a 3-cm cyst on his kidney, fatty liver, high cholesterol, internal bleeding from hemorrhoids, and has recently undergone back surgery.  (Dkt. 19 ¶ 9.)  There is no confirmed medical diagnosis for diabetes or liver disease in possession of Respondents.  (Dkt. 60.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231 and is within the 90-day mandatory detention period.  (Dkt. 59 ¶ 12.)  He has no

convictions for a crime of violence and has lived in the United States since October 2010. (Dkt. 19 ¶ 9.)

Petitioner Fernando C.Z. is a 31-year-old citizen of Mexico who has been detained by ICE at the SCJ for four-and-half months.  (Dkt. 19 ¶ 10.)  He claims a history of recurrent Bell's Palsy, which can be caused by respiratory illnesses and can result in paralysis of the face that may be permanent and lead to blindness.  (Dkt. 19 ¶ 10; Dkt. 70-1.)  There are no verified medical diagnoses for these conditions within the possession of Respondents.  (Dkt. 60.)  He has no convictions for crimes of violence, has lived in the United States since 1990, is married to a United States citizen, and has a child who is a United States citizen.  (Dkt. 19 ¶ 10.)  This Petitioner is being held in custody pending removal pursuant to 8 U.S.C. § 1226(a).  (Dkt. 59 ¶ 10.)  An immigration judge denied him bond based on a finding of danger to community as the result of a DWI, giving a peace officer a false name, and four alcohol violations under the age of 21.  (Dkt. 59 ¶ 10.)  He is scheduled to be removed the week of April 26th.  (Dkt. 75.)

Petitioner Gregorio M.G. is a 59-year-old citizen of Mexico who has been detained by ICE at the SCJ for four months.  (Dkt. 19 ¶ 11.)  He claims to suffer from hypertension, high blood pressure, anxiety, and depression.  (Dkt. 19 ¶ 11.)  Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19. (Dkt. 59 ¶ 16; Dkt. 60.)  He has no convictions for crimes of violence and has resided in the United States for twenty-two years.  (Dkt. 19 ¶ 11.)  This Petitioner is being held in custody pending removal pursuant to 8 U.S.C. § 1226(a).  (Dkt. 59 ¶ 10.)  An

immigration judge denied him bond based on a finding of danger to community as the result of one DWI conviction and one pending DWI charge.  (Dkt. 59 ¶ 10.)

Petitioner Ilyas J. is a 53-year-old citizen of Canada who had been detained by ICE for ten months and specifically at the SCJ for three months.  (Dkt. 19 ¶ 12.)  He asserts that he suffers from high blood pressure, high cholesterol, and diabetes.  (Dkt. 19 ¶ 12.)  Ilyas J. has been released due to heightened risk of COVID-19.  (Dkt. 59 ¶ 19.)

Petitioner Inemo C. is a 58-year-old citizen of Nigeria who has been detained by ICE at the SCJ for fourteen months.  (Dkt. 19 ¶ 13.)  He claims to suffer from diabetes; persistent fluid/congestion in his lungs for which he requires an inhaler and frequent rounds of antibiotics and for which he has not received follow-up care; gum disease, and sinus issues.  (Dkt. 19 ¶ 13.)  He also claims a history of pneumonia and obstructive sleep apnea.  (Dkt. 19 ¶ 13.)  Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19.  (Dkt. 59 ¶ 16; Dkt. 60.)  Inemo C. is being detained following a final order of removal pursuant to 8 U.S.C. § 1231.  (Dkt. 59 ¶ 12.)  He claims he has no convictions for crimes of violence, has lived in the United States for thirty-three years, and has ten family members who are United States citizens.  (Dkt. 19 ¶ 13.)  The ICE Field Office Director determined that release is not warranted for this Petitioner because of his danger to the community, including felony fraud charges and failure to comply with a removal order.  (Dkt. 59 ¶ 18.)

Petitioner Jose M. is a 57-year-old citizen of Cuba who has been detained by ICE at the SCJ for eight months.  (Dkt. 19 ¶ 14.)  He claims to suffer from COPD, emphysema, depression, schizophrenia, PTSD, and bulging disks in his back, and is

16

considered obese under the World Health Organization's ("WHO") standards.[4]  (Dkt. 19 ¶ 14.)  Respondents concede that Petitioner will most likely qualify as someone at a higher risk for COVID-19.  (Dkt. 83 ¶ 7.)  The statutory basis for detaining Jose M. recently changed from 8 U.S.C. § 1225 to 8 U.S.C. § 1231 when he received a final order of removal.  (Dkt. 75.)  He has no history of violent crimes and has lived in the United States for fifty-two years.  (Dkt. 19 ¶ 14.)

Petitioner Jose P.M. is a 52-year-old citizen of Mexico who has been detained by ICE at the SCJ for four months.  (Dkt. 19 ¶ 15.)  He claims to suffer from large granular lymphoma leukemia, high blood pressure, a history of Hepatitis C, Vitamin D deficiency, PTSD, schizophrenia, and unspecified breathing difficulties.  (Dkt. 19 ¶ 15.)  Additionally, by WHO's classifications, Jose P.M. claims that he is considered obese.  (Dkt. 19 ¶ 15.)  Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19.  (Dkt. 59 ¶ 16; Dkt. 60.)  Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231.  (Dkt. 59 ¶ 12.)  The ICE Field Office Director has determined that this Petitioner's release is not warranted given that he is a danger to the community related to his thefts, controlled substance violations, battery, DWI, and obstructing law enforcement.  (Dkt. 59 ¶ 18.)  He has lived in the United States for forty-four years.  (Dkt. 19 ¶ 15.)

Petitioner Mario S. is a 43-year-old citizen of Mexico who has been detained by ICE at the SCJ for four months. (Dkt. 19 ¶ 16.)  He asserts that he is pre-diabetic which

---

[4]     Under the WHO's guidelines, a BMI of 30 and higher is considered obese.  *See* WHO, *Obesity* (last visited April 27, 2020), https://www.who.int/topics/obesity/en/.

requires careful attention to his nutrition.  (Dkt. 19 ¶ 16.)  This Petitioner is being detained as an arriving alien pursuant to 8 U.S.C. § 1225.  (Dkt. 59 ¶ 13.)  He has no convictions for crimes of violence and has lived in the United States for one year.  (Dkt. 19 ¶ 16.)

Petitioner Mohamed M. is a 28-year-old male who has been detained by ICE at the SCJ for three months.  (Dkt. 19 ¶ 17.)  He claims to suffer from peptic ulcers and depression.  (Dkt. 19 ¶ 17.)  He has no history of convictions for crimes of violence and has lived in the United States for four years.  (Dkt. 19 ¶ 17.)  Mohamed M. is being held in custody pending removal pursuant to 8 U.S.C. § 1226(c).  (Dkt. 59 ¶ 11.)

Petitioner Marcel N. is a 58-year-old citizen of Cameroon who has been detained by ICE at the SCJ for five months.  (Dkt. 19 ¶ 18.)  He suffers from a history of a brain tumor, high blood pressure, and seizures.  (Dkt. 19 ¶ 18.)  Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19.  (Dkt. 59 ¶ 16; Dkt. 60.)  Petitioner is being detained as an arriving alien pursuant to 8 U.S.C. § 1225.  (Dkt. 59 ¶ 13.)  Petitioner claims he has no criminal history and has lived in the United States since 2016.  (Dkt. 19 ¶ 18.)  The ICE Field Office Director determined that release is not warranted for Petitioner because of his danger to the community, including charges for assault and fleeing police.[5]  (Dkt. 59 ¶ 18.)

---

[5]     The evidence before the Court indicates that Marcel N., although arrested for Assault and Fleeing a Police Officer, was in fact charged with Careless Driving and No Minnesota's Driver's License.  (*See* Dkt. 67; Dkt. 67-1 (Criminal Complaint), Dkt. 67-2 at 5 (immigration judge decision noting arrest and charges).)

Petitioner Saidi O. is a 42-year-old citizen of Nigeria who had been detained by ICE for thirteen months and specifically, at the SCJ for five months. (Dkt. 19 ¶ 19.) Since the filing of the Amended Petition, Saidi O. has been moved from the SCJ in preparation for removal. (Dkt. 75.)

Petitioner Vikor S. is a 30-year-old citizen of Haiti who had been detained by ICE at the SCJ for eighteen months. (Dkt. 19 ¶ 20.) This Petitioner has been released from custody for unspecified reasons. (Dkt. 59 ¶ 20.)

Petitioner Yaasiin A.I. is a 27-year-old male who has been detained by ICE at the SCJ for three months. (Dkt. 19 ¶ 21.) He claims to be suffering from medical conditions, though at present these cannot be specified. (Dkt. 19 ¶ 21.) Yaasiin A.I. is being held in custody pending removal pursuant to 8 U.S.C. § 1226(c). (Dkt. 59 ¶ 11.)

Petitioner Zacarias W. is a 31-year-old citizen of Guatemala who has been detained by ICE at the SCJ for three months. (Dkt. 19 ¶ 22.) Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19. (Dkt. 59 ¶ 16; Dkt. 60.) This Petitioner claims he has no history of convictions for crimes of violence and has lived in the United States for four years. (Dkt. 19 ¶ 22.) The ICE Field Office Director has determined that release is not warranted for this Petitioner because he is a danger to the community as a result of his two outstanding warrants related to drugs. (Dkt. 59 ¶ 18.)

Petitioner Favio E.N.G. is a 58-year-old male who has been detained by ICE for one month and is currently at the SCJ. (Dkt. 19 ¶ 23.) He has lived in the United States for fifteen (15) years. (Dkt. 19 ¶ 23.) This Petitioner claims an increased risk due to his

age.  (Dkt. 19 ¶ 23.)  He is being detained following a final order of removal to 8 U.S.C.

§ 1231 and is within the 90-day mandatory detention period.  (Dkt. 59 ¶ 12.)

Petitioner Fernando U.M. has been removed to his country of record.  (Dkt. 59 ¶

21.)

Petitioner Rodolfo M.C. is a 38-year-old male who has been detained by ICE at

the SCJ for eight months. (Dkt. 19 ¶ 25.)  He claims to suffer from medical conditions

though at present these cannot be specified.  (Dkt. 19 ¶ 25.)  He has lived in the United

States for five years.  (Dkt. 19 ¶ 25.)  Rodolfo M.C. is being held in custody pending

removal pursuant to 8 U.S.C. § 1226(a).  (Dkt. 59 ¶ 10.)  An immigration judge denied

him bond based on a finding of danger to community as the result of two pending DWI

charges.  (Dkt. 59 ¶ 10.)

Petitioner Ever F.H. is a 21-year-old male who has been detained by ICE at the

SCJ for nine months.  (Dkt. 19 ¶ 26.)  He claims to suffer from medical conditions

though at present these cannot be specified.  (Dkt. 19 ¶ 26.)  He has lived in the United

States for five years.  (Dkt. 19 ¶ 26.)  This Petitioner is being detained as an arriving alien

pursuant to 8 U.S.C. § 1225.  (Dkt. 59 ¶ 13.)

Petitioner Samatar A.N. is a 38-year-old male who has been detained by ICE at the

SCJ for ten months.  (Dkt. 19 ¶ 27.)  He claims to suffer from medical conditions though

at present these cannot be specified.  (Dkt. 19 ¶ 27.)  He has lived in the United States for

twenty-four years.  (Dkt. 19 ¶ 27.)  Samatar A.N. is being held in custody pending

removal pursuant to 8 U.S.C. § 1226(c).  (Dkt. 59 ¶ 11.)

Petitioner Elder E.G.R. had been detained by ICE at the SCJ. (Dkt. 19-1 ¶ 2.) On April 3, 2020, Elder began experiencing flu-like symptoms, including headaches, nauseous and diarrhea, but has not been tested for COVID-19. (Dkt. 19-1 ¶ 4.) Elder has been released from custody for unspecified reasons. (Dkt. 59 ¶ 20.)

Petitioner Kwafi A. is a 42-year-old who has been detained by ICE for two months and is currently at the SCJ. (Dkt. 19 ¶ 32.) He has lived in the United States for nine years. (Dkt. 19 ¶ 32.) Federal Respondent concedes that this Petitioner is at a higher risk if he contracts COVID-19. (Dkt. 59 ¶ 16; Dkt. 60.) He is being detained following a final order of removal to 8 U.S.C. § 1231 and is within the 90-day mandatory detention period. (Dkt. 59 ¶ 12.)

### 2.  Petitioners with No Claimed Severe Risk Related to COVID-19

Petitioner Fredi J. is a 32-year-old male who had been detained by ICE for one month at the SCJ. (Dkt. 19 ¶ 29.) Fredi J. has been released from custody. (Dkt. 59 ¶ 20.)

Petitioner Benito J.F. is a 36-year-old who has been detained by ICE for eight months and is currently at the SCJ. (Dkt. 19 ¶ 30.) He has lived in the United States for twenty-two years. (Dkt. 19 ¶ 30.) Benito is being held in custody pending removal pursuant to 8 U.S.C. § 1226(a). (Dkt. 59 ¶ 10.) An immigration judge denied Benito J.F. bond based on a finding of danger to community as the result of a DWI and disorderly conduct. (Dkt. 59 ¶ 10.)

Petitioner Zakari L. is a 29-year-old who has been detained by ICE for seven months and is currently at the SCJ. (Dkt. 19 ¶ 31.) He has lived in the United States for

nine years.  (Dkt. 19 ¶ 31.)  This Petitioner is being detained following a final order of

removal pursuant to 8 U.S.C. § 1231 and is within the 90-day mandatory detention

period.  (Dkt. 59 ¶ 12.)

Petitioner Pedro C.M. is a 23-year-old who has been detained by ICE for three

months and had been detained at the SCJ.  (Dkt. 19 ¶ 33.)  He has lived in the United

States for six years.  (Dkt. 19 ¶ 33.)  This Petitioner is being detained following a final

order of removal pursuant to 8 U.S.C. § 1231 and is within the 90-day mandatory

detention period.  (Dkt. 59 ¶ 12.)  He has been moved from the SCJ in preparation for

removal.  (Dkt. 75.)

Petitioner Jeremiah N. is a 28-year-old who had been detained by ICE for two

months and had been detained at the SCJ.  (Dkt. 19 ¶ 34.)  Jeremiah N. has been released

from custody.  (Dkt. 59 ¶ 20.)

Petitioner Samuel L.J. is a 35-year-old who has been detained by ICE for one

month and had been detained at the SCJ.  (Dkt. 19 ¶ 35.)  He has lived in the United

States for nineteen years.  (Dkt. 19 ¶ 35.)  Samuel L.J. is being held in custody pending

removal pursuant to 8 U.S.C. § 1226(a).  (Dkt. 59 ¶ 10.)  An immigration judge denied

him bond based on a finding of danger to community as the result of a DWI conviction

and one pending DWI.  (Dkt. 59 ¶ 10.)  Samuel L.J. has been moved from the SCJ in

preparation for removal.  (Dkt. 75.)

Petitioner Hillary K. is a 33-year-old who has been detained by ICE for seventeen

months and is currently at the SCJ.  (Dkt. 19 ¶ 36.)  He has lived in the United States for

fourteen years.  (Dkt. 19 ¶ 36.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231.  (Dkt. 59 ¶ 12.)

Petitioner Edmond L. is a 33-year-old who has been detained by ICE for three months and is currently at the SCJ.  (Dkt. 19 ¶ 37.)  He has lived in the United States for twenty years.  (Dkt. 19 ¶ 37.)  Edmond L. is being held in custody pending removal pursuant to 8 U.S.C. § 1226(c).  (Dkt. 59 ¶ 11.)

Petitioner Abdinajib W. is a 34-year-old who has been detained by ICE for one month and is currently at the SCJ.  (Dkt. 19 ¶ 38.)  He has lived in the United States for fourteen years.  (Dkt. 19 ¶ 38.)  Abdinajib W. is being held in custody pending removal pursuant to 8 U.S.C. § 1226(c).  (Dkt. 59 ¶ 11.)

Petitioner Rudra N. is a 24-year-old who has been detained by ICE for one month and is currently at the SCJ. (Dkt. 19 ¶ 39.)  He has lived in the United States for three years.  (Dkt. 19 ¶ 39.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231 and is within the 90-day mandatory detention period.  (Dkt. 59 ¶ 12.)

Petitioner Jose M.G.C. is a 30-year-old who has been detained by ICE for four months and had been detained at the SCJ.  (Dkt. 19 ¶ 40.)  He has lived in the United States for sixteen years.  (Dkt. 19 ¶ 40.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231 and is within the 90-day mandatory detention period.  (Dkt. 59 ¶ 12.)  He has been moved from the SCJ in preparation for removal.  (Dkt. 75.)

Petitioner Leonel G.A. is a 21-year-old who has been detained by ICE for one month and is currently at the SCJ.  (Dkt. 19 ¶ 41.)  He has lived in the United States for five years.  (Dkt. 19 ¶ 41.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231 and is within the 90-day mandatory detention period.  (Dkt. 59 ¶ 12.)

Petitioner Alexis G.A. is a 24-year-old who has been detained by ICE for about one month and is currently at the SCJ.  (Dkt. 19 ¶ 42.)  He has lived in the United States for nineteen years.  (Dkt. 19 ¶ 42.)  Alexis is being held in custody pending removal pursuant to 8 U.S.C. § 1226(a).  (Dkt. 59 ¶ 10.)  An immigration judge denied Alexis bond based on a finding of danger to community as the result of an unidentified extensive criminal history.  (Dkt. 59 ¶ 10.)

Petitioner Ignacio G.M. is a 21-year-old who had been detained by ICE for two months and had been detained at the SCJ.  (Dkt. 19 ¶ 43.)  Ignacio has been removed from the United States.  (Dkt. 75.)

Petitioner Adrian R.V. is a 28-year-old who has been detained by ICE for approximately one-and-a-half months and is currently at the SCJ.  (Dkt. 19 ¶ 44.)  He has lived in the United States for twenty-seven years.  (Dkt. 19 ¶ 44.)  Alexis R.V. is being held in custody pending removal pursuant to 8 U.S.C. § 1226(a).  (Dkt. 59 ¶ 10.)  An immigration judge denied him bond based on a finding of danger to community as the result of a DWI and reckless driving.  (Dkt. 59 ¶ 10.)

Petitioner Angel R. is a 19-year-old who has been detained by ICE for approximately one-and-a-half months and is currently at the SCJ.  (Dkt. 19 ¶ 45.)  He has

lived in the United States for seventeen years.  (Dkt. 19 ¶ 45.)  Angel R. is being held in custody pending removal pursuant to 8 U.S.C. § 1226(a).  (Dkt. 59 ¶ 10.)  An immigration judge denied him bond based on a finding of danger to community as the result of violating an order for protection and a pending DWI charge.  (Dkt. 59 ¶ 10.)

Petitioner Omar A.C. is a 28-year-old who has been detained by ICE for four months and is currently at the SCJ.  (Dkt. 19 ¶ 46.)  He has lived in the United States for twenty-two years. (Dkt. 19 ¶ 46.)  Omar A.C. is being held pursuant to 8 U.S.C. § 1226(a).  (Dkt. 59 ¶ 10.)  An immigration judge denied him bond based on a finding of danger to community (multiple DWIs).  (Dkt. 59 ¶ 10.)

Petitioner Cordoba H.I. is a 28-year-old who has been detained by ICE for one-and-a-half months and is currently at the SCJ.  (Dkt. 19 ¶ 47.)  He has lived in the United States for two years.  (Dkt. 19 ¶ 47.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231.  (Dkt. 59 ¶ 12.)

Petitioner Pah D. is a 33-year-old who has been detained by ICE for three months and is currently at the SCJ.  (Dkt. 19 ¶ 48.)  He has lived in the United States for eight years.  (Dkt. 19 ¶ 48.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231.  (Dkt. 59 ¶ 12.)

Petitioner Diego L.C. is a 31-year-old who has been detained by ICE for three months and is currently at the SCJ.  (Dkt. 19 ¶ 49.)  He has lived in the United States for two years.  (Dkt. 19 ¶ 49.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231.  (Dkt. 59 ¶ 12.)

Petitioner Oscar R.M. is a 25-year-old who had been detained by ICE for one month and detained at the SCJ.  (Dkt. 19 ¶ 50.)  Oscar R.M. has been removed from the United States.  (Dkt. 75.)

Petitioner Jose E.C.B. has been removed to his country of record.  (Dkt. 59 ¶ 21.)

Petitioner Sergio G. is a 48-year-old who has been detained by ICE for about one month and is currently at the SCJ.  (Dkt. 19 ¶ 52.)  He has lived in the United States for twenty-four years.  (Dkt. 19 ¶ 52.)  This Petitioner is being detained pursuant to 8 U.S.C. § 1226(a) with a pending bond order.  (Dkt. 59 ¶ 14.)

Petitioner Oscar A.F.C. is a 39-year-old who alleges that he has been detained by ICE for two months and is currently at the SCJ.  (Dkt. 19 ¶ 53.)  He has lived in the United States for eighteen years.  (Dkt. 19 ¶ 53.)  Federal Respondent states that this Petitioner is not being detained by ICE but is in the custody of the U.S. Marshals for criminal prosecution.  (Dkt. 59 ¶ 22.)

Petitioner Jorge V. is a 33-year-old who has been detained by ICE for one month and is currently at the SCJ.  (Dkt. 19 ¶ 54.)  He has lived in the United States for twelve years.  (Dkt. 19 ¶ 54.)  This Petitioner is being detained following a final order of removal pursuant to 8 U.S.C. § 1231 and is within the 90-day mandatory detention period.  (Dkt. 59 ¶ 12.)

Petitioner Edwin S. has been removed to his country of record.  (Dkt. 59 ¶ 21.)

## D.     Sherburne County Jail

The SCJ is a detention facility with 732 beds.  (Dkt. 46-1 ¶ 12.)  The SCJ employs approximately 120 individuals.  *See* Sherburne Cty. Sheriff's Office, *Jail* (last

visited April 27, 2020), https://www.co.sherburne.mn.us/400/Jail.  Included in the inmate population are inmates under the control of Sherburne County, ICE, the United States Marshal, the Bureau of Indian Affairs, and other agencies.  (Dkt. 46-1 ¶ 12; Dkt. 53 ¶ 7.)  ICE has a contract with the SCJ to house ICE detainees and to provide them with food, shelter, and medical care.  (Dkt. 59 ¶ 5.)

In response to the COVID-19 pandemic, SCJ administration asked ICE to discontinue bringing in any detainees to the SCJ other than those determined by the agency to be a public safety threat.  (Dkt. 53 ¶ 7.)  No new ICE detainees were booked into the SCJ between March 18 and April 10, 2020.  (Dkt. 53 ¶ 7.)  While one detainee was booked into the SCJ on April 10, the detainee was quarantined in medical isolation within a negative pressure cell[6] and was transported out of the SCJ as part of his deportation proceedings on April 13, 2020.  (Dkt. 53 ¶ 7.)  Further, a number of existing ICE detainees have been transferred since March 2020.  (Dkt. 53 ¶ 8.)  On March 16, 2020, the SCJ housed 296 ICE detainees.  (Dkt. 53 ¶ 8.)  As of April 10, 2020, the SCJ housed 185 ICE detainees, a reduction of approximately one-third.  (Dkt. 53 ¶ 8.)  In addition to reducing the intake and population of ICE detainees, the SCJ has worked with other agencies, including the U.S. Marshal's Service and local law enforcement to limit the intake of all inmates into the facility.  (Dkt. 53 ¶ 10.)  On March 16, 2020, the total SCJ population (including all inmates and detainees) was 606.  (Dkt. 53 ¶ 10.)  As of

---

[6]      A negative-pressure cell is mechanically ventilated to generate negative pressure, which prevents contaminated air from escaping.  (Dkt. 53 ¶ 16.)  The SCJ has three negative pressure cells.  (Dkt. 53 ¶ 16.)  The air from these rooms is vented directly outside of the facility.  (Dkt. 76 ¶ 27.)

April 10, 2020, the total SCJ population was reduced to 450.  (Dkt. 53 ¶ 10.)

There are two housing units at SCJ, Alpha and Omega, that are set aside for ICE detainees.  (Dkt. 53 ¶ 9.)  On March 16, 2020, there were 95 detainees in the Alpha unit, where the original Petitioners in this matter were housed.  (Dkt. 53 ¶ 9.)  As of April 10, 2020, the population of the Alpha unit had been reduced to 57.  (Dkt. 53 ¶ 9.)  The Omega unit had a population of 103 detainees on March 16, but as of April 10, that population had been reduced to 63 ICE detainees.  (Dkt. 53 ¶ 9.)  The remaining Petitioners are housed in the Alpha unit.  Since the filing of the Amended Petition, 16 of the 55 Petitioners have left the SCJ, as the result of release, removal, or transfer.  (Dkt. 75.)

The SCJ has also taken additional protective measures in light of the COVID-19 pandemic.  On March 13, 2020, the SCJ implemented a quarantine process for all new arrivals (including all inmates and detainees), in which arrivals are screened before they enter the jail and prior to booking, and are then placed in one of 24 individual quarantine cells for 14 days.  (Dkt. 53 ¶ 13.)  An inmate/detainee will then move into their unit and not move unless they are reassigned.  (Dkt. 76 ¶ 31.)  Petitioners assert that since the filing of the Amended Petition there have been transfers of individuals into the Alpha unit.  (Dkt. 90 at 2-3.)  During the isolation period, each inmate is monitored and screened by a licensed medical professional for signs or symptoms of illness.  (Dkt. 53 ¶ 13.)  An inmate displaying signs or symptoms of an illness is seen by a licensed medical professional and treated accordingly.  (Dkt. 53 ¶ 13.)

SCJ provides medical care through an on-site medical clinic staffed by licensed

medical professionals.  (Dkt. 53 ¶ 3.)  All medical staff are licensed or certified for their respective positions.  (Dkt. 53 ¶ 3.)  SCJ also contracts with an independent medical doctor and a licensed mental health clinical counselor to do a peer review of clinic operations and review charts for patient care.  (Dkt. 53 ¶ 3.)  The SCJ medical staff includes a nurse practitioner, a nursing director, nine registered nurses, 14 health technicians, and a team of mental health professionals.  (Dkt. 53 ¶ 3.)  That said, the SCJ acknowledges that they do not have the ability to test for COVID-19.  (Dkt. 53 ¶ 15.)  If a detainee displays symptoms of the virus and tests negative for influenza and strep, SCJ administration defers to medical staff to determine if the individual should be transported to a hospital or clinic for further testing.  (Dkt. 53 ¶ 15.)  If testing was not available or recommended, an inmate is to be placed in medical isolation or other housing as recommended by medical staff.  (Dkt. 53 ¶ 15.)  Petitioners' expert, Dr. Peterson, opines that while these procedures are well-intended, it is unlikely that these quarantine measures will prevent an outbreak where many are asymptomatic, and many may spread the virus before experiencing symptoms.  (Dkt. 46-1 ¶ 14(i)-(l).)  Petitioners' expert John D. Cahill, M.D., attending physician in Infectious Diseases and Emergency Medicine at Mount Sinai Morningside Hospital in Manhattan, New York, stated in his declaration that without reliable testing it is not possible to determine who is infected given that many persons are asymptomatic, or develop symptoms only after they have become

contagious.[7]  (Dkt. 69-2 ¶ 4.)  He asserts that infectiousness for COVID-19 starts 2.3 days before symptom onset with the peak of virus shedding and resultant transmissibility of the disease occurring 0.7 to 2 days before symptom onset.  (Dkt. 69-4 ¶ 2.)

Should any individual at the jail be diagnosed with COVID-19, the SCJ would be required to notify ICE immediately.  (Dkt. 59 ¶ 9.)  As of April 15, 2020, there were no confirmed cases of COVID-19 at the SCJ.  (Dkt. 53 ¶ 18.)  One inmate was sent for COVID-19 testing, however, the test results were negative.  (Dkt. 53 ¶ 19.)  Respondents also represented at the April 22, 2020 hearing that there had been no confirmed cases of COVID-19 at the SCJ.

In addition, the SCJ has taken steps to minimize the risk of the virus spreading in the facility through the air.  This includes controlling the air intake and exhaust through the SCJ's nine separate air exchange units allowing it to isolate 12 distinct "smoke zones," which can be set to bring in a certain percentage of fresh air to the SCJ while exhausting the same amount of indoor air.  (Dkt. 53 ¶ 21.)  This ventilation system can exhaust and renew up to 100% of the air within a given zone.  (Dkt. 53 ¶ 21.)  The return air is passed through a MERV-8 filter before being returned to the jail.  (Dkt. 53 ¶ 21.)  While the SCJ's air exchange system is typically set at approximately 20% (meaning that 20% of the air exchanged is air from outside the Jail), the SCJ has adjusted the air

---

[7]     This Court notes that except for Dr. Peterson's Second Declaration (Dkt. 69-4), the expert declarations and affidavits relied upon by Petitioners respond to the March 25, 2020 Affidavit of Brian Frank (to the extent that they respond at all to the information provided by the SCJ), as opposed to his later April 15, 2020 Affidavit, which includes additional measures taken to prevent the spread of COVID19 within the SCJ not reflected in the March 25th Affidavit.

exchange to 80% for all zones.  (Dkt. 53 ¶ 21.)  SCJ administration acknowledges that 100% air exchange is not possible under various weather conditions, such as when outside temperatures fall below freezing.  (Dkt. 53 ¶ 21.)  Petitioners' expert Dr. Peterson asserts that while these procedures minimize airborne transmission of the virus, they are not airtight, given that recent evidence points to transmission by contact with contaminated surfaces and the asymptomatic spread of the disease.  (Dkt. 46-1 ¶ 14(a)-(b).)

With respect to sanitizing surfaces, the SCJ cleans all frequently touched surfaces in housing units, such as tables, handrails, and door handles, four times a day with a chemical known to kill viruses.  (Dkt. 53 ¶ 22.)  Additional cleaning occurs after every meal and the nightly lockdown, the SCJ hallways are cleaned and disinfected three times per day, the floors are disinfected and cleaned once a day, and the SCJ has retained a contractor since April 7 to sanitize touch points in the SCJ, including in the housing units three times per week. (Dkt. 53 ¶ 22.)  Petitioners assert that a cleaning company comes 1 to 2 times per week and only sprays an herbicide (plant killer) on tables, door handles, and chairs.  (Dkt. 90 at 2.)  Pod workers, who are detainees from the unit, have been cleaning the tables, chairs, vending machine, phones, video visitation booths, handrails and other touchpoints at the end of each rotation in the dayroom for the past several weeks.  (Dkt. 76 ¶ 35.)  Pod workers are given instructions on proper cleaning techniques.  (Dkt. 76 ¶ 35.)  Dr. Peterson opined that no amount of cleaning, however, can prevent the coronavirus from entering the facility and that in his opinion de-carceration is a "better alternative" to reduce the risk of an individual contracting

COVID-19 while in the jail.  (Dkt. 46-1 ¶ 14(g)-(h); Dkt. 69-4 ¶¶ 1, 8.)  Similarly, Dr. Cahill opines that no amount of cleaning, sanitation, hand washing, or wearing masks without social distancing will prevent a contagion.  (Dkt. 69-2 ¶ 5.)

The SCJ administration has also made attempts to enable the SCJ population to better comply with social distancing.[8]  (Dkt. 53 ¶ 24.)  That said, SCJ Administration acknowledges that social distancing in any institutional or public community setting is difficult to enforce if individuals do not wish to comply.  (Dkt. 53 ¶ 24(e).)

Under current housing conditions, all the detainees in the Alpha unit are single

---

[8]     Interim guidance provides as follows:

Although strict social distancing may not be possible in congregate settings such as detention facilities, all facilities housing ICE detainees should implement the following measures to the extent practicable:

- Efforts should be made to reduce the population to approximately 75% of capacity.
- Where detainee populations are such that such cells are available, to the extent possible, house detainees in individual rooms.
- Recommend that detainees sharing sleeping quarters sleep "head-to-foot."
- Extend recreation, law library, and meal hours and stagger detainee access to the same in order to limit the number of interactions between detainees from other housing units.
- Staff and detainees should be directed to avoid congregating in groups of 10 or more, employing social distancing strategies at all times.
- Whenever possible, all staff and detainees should maintain a distance of six feet from one another.
- If practicable, beds in housing units should be rearranged to allow for sufficient separation during sleeping hours.

See U.S. Imm., and Customs Enforc. ERO, *COVID-19 Pandemic Response Requirements* (last visited April 27, 2020), https://www.ice.gov/doclib/coronavirus/ eroCOVID19responseReqsCleanFacilities.pdf.

bunked.  (Dkt. 53 ¶ 24(a).)  Petitioners concede this fact.  (Dkt. 90 at 3.)  The SCJ has also reduced the number of inmates allowed out of their cells at any one time to half the population, including during: meals where half the population is allowed to leave their rooms to get their meals and eat them in their cells and the other half eat in the dayroom; and otherwise only giving inmates and detainees 4 hours a day out of their cells, with a rotating schedule allowing half of the population to use the dayroom for 2 hours at a time.  (Dkt. 53 ¶ 24(b)-(d).)  According to SCJ administration, under this current practice, it is possible for all detainees in the Alpha and Omega units to maintain the recommended 6-foot social distancing while using the dayrooms in those units.  (Dkt. 53 ¶ 24(e).)  Dr. Peterson opines that despite these measures, given the asymptomatic nature of the disease and the lack of testing, COVID-19 will get into and spread within the SCJ.  (Dkt. 69-4 ¶¶ 4-5.)

After the hearing, the County Respondent provided photographs of the dayroom in the Alpha unit.  The photographs appear to show that detainees have the capability to maintain 6-foot social distancing if they so desire.[9]  (Dkt. 76 ¶ 3; Dkt. 77, Ex. 1.)  In addition, staff is instructed to encourage social distancing such that groups should not be allowed to gather.  (Dkt. 76 ¶ 25.)  While detainees have room to socially distance, some choose to congregate together to visit or to play cards, for example.  (Dkt. 76 ¶ 3.)  Petitioners assert that socially distancing "is a dream" noting that people can clearly be

---

[9]    Petitioners sought to strike the post-hearing submissions (Dkt. 85), however, the Court denies the request as the Court asked for this information during the hearing, and because Petitioners were given the opportunity to respond to these submissions.  (Dkt. 88.)

seen congregating around tables in the videos. (Dkt. 90 at 1.) Correctional Officers

("CO") in the Alpha unit report that all detainees have respected those who want to

practice social distancing. (Dkt. 76 ¶ 12.) If a detainee chooses to socially distance

themselves in the spaces provided, COs will not allow other detainees to encroach on

their space. (Dkt. 76 ¶ 14.) This includes not allowing detainees to crowd around

another detainee while making a phone call or during a video visitation. (Dkt. 76 ¶ 14.)

The phones are spread out throughout the unit, however, the video phones are two

screens right next to each other. (Dkt. 76 ¶ 4; Dkt. 77, Ex. 1.) There are generally no

detainees waiting in line to make phone calls or for a video visitation. (Dkt. 76 ¶¶ 15-

16.) Detainees can see from the dayroom when the phones are open and video visitation

times are scheduled visits and there is a standard 10-minute wait time between scheduled

calls. (Dkt. 76 ¶¶ 15-16.) Petitioners, however, claim that the video booths are always

crowded. (Dkt. 90 at 1.)

Some detainees choose to stay in their cell for some or all of the time their group

is allowed out in the dayroom. (Dkt. 76 ¶ 3.) Even with the reduced population, it is

common for less than all of the detainees to be out of their cells at the same time, even

when allowed to do so. (Dkt. 76 ¶ 3.)

The dayrooms contain a sink, liquid soap, and towels for detainees' use. (Dkt. 76

¶ 8.)

The Alpha unit contains separate metal shower stalls covered by a curtain. (Dkt.

76 ¶ 21; Dkt. 77, Ex. 1.) Detainees are provided with a disinfectant spray and directions

on how to use the disinfectant on the showers. (Dkt. 76 ¶ 21.) Respondents assert that

the showers are only cleaned once a day and dispute that they are provided with any disinfectants to clean the showers. (Dkt. 90 at 2.)

Changes have also been made to internal delivery systems to minimize person-to-person contact. (Dkt. 53 ¶ 27.) This includes delivery of commissary items and laundry to inmates in their individual cells after the pod locks down for the evening, and the use of legal carts is limited to when inmates are otherwise allowed to be out of their cells in the dayroom. (Dkt. 53 ¶ 27; Dkt. 76 ¶ 20.)

Delivery of medications is done in the main hallway of a unit using a pass-through in a door. (Dkt. 53 ¶ 27.) Medical staff observes the inmate through a window in the door. (Dkt. 53 ¶ 27.) Medical staff have been required to wear a mask and a face shield or goggles while delivering medications since April 5, 2020. (Dkt. 53 ¶ 27.) For the Alpha unit, medications are delivered at the door behind the CO station. (Dkt. 76 ¶ 19.) Detainees are reminded to stay six feet apart, though some do naturally tend to encroach. (Dkt. 76 ¶ 19.) In response, the SCJ has now placed tape on the floor showing six-foot separation. (Dkt. 76 ¶ 19.) Petitioners assert that this new spacing procedure only started right after the hearing with the Court. (Dkt. 90 at 1.)

As of April 22, 2020, signs have been posted in the Alpha unit, in both English and Spanish, reminding detainees to keep six feet apart, providing instructions regarding covering coughs and washing hands, and containing information from the CDC and ICE on how to stop the spread of germs, including COVID-19. (Dkt. 76 ¶ 22; Dkt. 77 at 8-11.)

SCJ administration has also implemented changes to staff procedures to limit the

chances of contamination or cross-contamination.  Since April 6, 2020, the SCJ has altered scheduling of staff to 12-hour shifts with seven days on and seven days off.  (Dkt. 53 ¶ 28(a).)  According to SCJ administration, the seven-day-off period allows staff to self-quarantine and monitor for any signs of illness.  (Dkt. 53 ¶ 28(a).)  If any signs of illness are reported, an additional quarantine period will be implemented.  (Dkt. 53 ¶ 28(a).)  All SCJ staff are screened and have their temperature taken when they arrive to work each day.  (Dkt. 53 ¶ 28(b).)  If any staff member has a temperature above 99.5 degrees Fahrenheit, the staff member is sent home and Minnesota Department of Health guidelines are followed before the person is allowed to return to work.  (Dkt. 53 ¶ 28(b).)  Staff is also required to not return to work for 14 days if they are exposed to anyone outside of the jail with respiratory disease symptoms.  (Dkt. 76 ¶ 24(V).)

Further, staff no longer receive face-to-face briefings, and staff is assigned to a single zone for their entire seven-day work period.  (Dkt. 53 ¶ 28(c)-(d).)  Separate break areas have been provided for staff in each zone and staff are instructed to maintain social distancing, and with the exception of designated "rovers," staff are generally required to stay within their zone except if needed to respond to emergencies.  (Dkt. 53 ¶ 28(d).)  There are typically only 2 to 3 COs in a unit at any one time.  (Dkt. 76 ¶ 6.)  Staff are instructed to maintain good social distancing from detainees at all times to the extent that it is practical.  (Dkt. 76 ¶ 24(III).)  The only individuals other than the detainees that are allowed into a unit are the assigned COs and supervisor as well as the professional contract cleaning company.  (Dkt. 76 ¶ 33.)

As of April 6, 2020, staff have been instructed to wear cotton masks while inmates

are out of their cells.  (Dkt. 53 ¶ 28(f).)  In addition, as of April 13, 2020, inmates and detainees have also been given cloth masks with instruction to wear the masks outside of their cells, and to wash the masks in their cells with a free bar of soap given to them. (Dkt. 53 ¶ 28(g); Dkt. 76 ¶ 6.)  Almost all of the detainees in the photograph of the dayroom appear to be wearing a mask on their face or at least on their person.  (Dkt. 77, Ex. 1.)  All staff are wearing masks.  (Dkt. 77, Ex. 1.)  Before detainees are allowed in the dayroom, an announcement is made to the detainees to remind them to wear their masks when they are out of their cells and to practice social distancing.  (Dkt. 76 ¶ 12.)  If a detainee leaves their cell without their mask, they will be reminded.  (Dkt. 76 ¶ 12.) COs in Alpha unit have reported that all detainees have been compliant with reminders to wear their masks out of their cells.  (Dkt. 76 ¶ 12.)  Respondents acknowledge the recent use of masks, although they claim the damage has already been done and that they are not worn during mealtime or while making calls.  (Dkt. 90 at 2.)

Along with free bars of soap, detainees are also provided with a washcloth and towels in their cell, which are laundered daily.  (Dkt. 76 ¶ 6.)

On April 10, 2020, the Minnesota Department of Corrections Inspection and Enforcement Unit responded to an inmate complaint regarding concerns about staff and the spread of COVID-19, and concluded that the SCJ measures to prevent the spread of COVID-19 exceeded the prevention measures taken by correctional facilities in Minnesota:

The facility has taken many steps to prevent the spread of COVID-19 including the following:

- acquisition of personal protective equipment such as masks and gloves
- implementing a cleaning schedule 4 times a day by inmate workers
- Contracted with a cleaning service to clean the facility 3 times a week
- Adjusting the HVAC system to increase the amount of fresh air to the facility
- Adjusting staffing schedules and establishing a zoned work schedule
- Screening staff as they enter the facility including the taking of temperatures

The steps taken by Sherburne County Jail Administration exceed the prevention measures being taken in correctional facilities across the state and do not violate any Rule provision.

(Dkt. 53-1.)

## E.    Amended Petition

The Amended Petition asserts two claims.

First, Petitioners claim that Respondents are violating their respective rights to Substantive Due Process under the Fifth and Fourteenth Amendments of the U.S. Constitution as a result of Respondents' cruel treatment and conditions of confinement in the form of failing to satisfy their affirmative duty to provide conditions of reasonable health and safety to Petitioners.  (Dkt. 19 ¶ 104.)  According to Petitioners, Respondents are presently acting with deliberate indifference to their health, safety, and well-being, as evidenced by Respondents continuing to detain them at the SCJ.  (Dkt. 19 ¶ 105.) Petitioners contend that Respondents are aware of the serious risks posed by COVID-19 to Petitioners, and that despite recommendations from numerous medical providers, Respondents have failed to take the only action recommended—Petitioners' release—that properly responds to their safety and medical needs.  (Dkt. 19 ¶¶ 105-106.)

Second, Petitioners claim that Respondents are violating their right to Substantive Due Process, as their continued detention at the SCJ under the current conditions and

38

amidst the COVID-19 pandemic amounts to unlawful punishment in violation of the Fifth and Fourteenth Amendments. (Dkt. 19 ¶ 108.) According to Petitioners, Respondents are subjecting them to a heightened risk of contracting COVID-19, for which there is no known cure, and therefore illness and death, as long as they remain confined to the SCJ. (Dkt. 19 ¶ 108.) Petitioners assert that because Respondents have not and cannot ensure the safety and health of Petitioners, Respondents are maintaining conditions that amount to punishment of all Petitioners. (Dkt. 19 ¶ 108.)

Petitioners seek an order from the Court issuing a Writ of Habeas Corpus on the ground that their continued detention violates the Due Process Clause and ordering their immediate release, with appropriate precautionary public health measures. (Dkt. 19 at 33.) In the alternative, they ask that the Court issue injunctive relief ordering Respondents to immediately release Petitioners, with appropriate precautionary public health measures, on the grounds that their continued detention violates Petitioners' constitutional due process rights. (*Id.*) Petitioners also seek a declaration that Respondents' continued detention in civil immigration custody of individuals at increased risk for severe illness, including all people age forty-five and older and persons of any age with underlying medical conditions that may increase the risk of serious COVID-19, violates the Fifth and Fourteenth Amendments.

**F.      Motion for Temporary Restraining Order and Preliminary Injunction**

Petitioners move the Court pursuant to Federal Rule of Civil Procedure 65(a) and (b) for a TRO or, in the alternative, for a preliminary injunction, requiring the Respondents to release them from their present detention at the SCJ to their homes under

such individually appropriate terms and conditions as will reasonably assure their future appearance in any immigration proceeding. The legal basis for the relief is that without release Respondents are depriving Petitioners of their rights to substantive due process by failing to provide for their health and safety and are subjecting them to unlawful punishment in violation of the Constitution. (Dkt. 45 at 36-46.)

## II.    LEGAL STANDARD

### A.    Habeas Corpus

Federal Respondent contends that this Court has no jurisdiction to consider the habeas relief sought by Petitioners with respect to the Petitioners in the Amended Petition who are in detention based on discretionary detention under 8 U.S.C. § 1226(a). (Dkt. 58 at 18.)

"Writs of habeas corpus may be granted by the Supreme Court, . . . the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a). The writ of habeas corpus under Section 2241 shall not extend to an individual unless "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." *Id.* § 2241(c)(3).

Congress has imposed statutory limits on habeas corpus petitions in immigration proceedings. For example, a petition for review from an order of removal cannot be brought under the habeas statute and must go directly to the circuit courts of appeals. *See* 8 U.S.C. § 1252(a)(5). While § 2241 confers jurisdiction upon federal courts to hear habeas challenges to the lawfulness of immigration-related detentions, *Zadvydas v.*

*Davis*, 533 U.S. 678, 687 (2001), judicial review of detention decisions made under 8

U.S.C. § 1226 is limited by the following provision:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review.  No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

*Id.* § 1226(e); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003).

Similarly, 8 U.S.C. § 1252(a)(2)(B)(ii) precludes judicial review of discretionary

decisions under § 1226(a):

> Notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to review[10] . . . any other decision or action . . . the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii).

There is no dispute that the protection of the Fifth Amendment's Due Process

Clause applies to "all 'persons' within the United States, including aliens, whether their

presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas*, 533 U.S. at 693

(string citation omitted).  On habeas review, "this Court may decide whether [a

detainee's] continued detention violates his constitutional due process rights."  *Mohamed

v. Sec'y Dep't of Homeland Sec.*, 376 F. Supp. 3d 950, 954 (D. Minn. 2018) (citation

---

[10]    The Court notes that this statute addresses only "jurisdiction to review."  "In the immigration context, 'jurisdiction to review' has a meaning distinct from 'habeas corpus,' and a statute stripping courts of the former does not also deprive them of the ability to hear a habeas challenge."  *See Sierra v. Immigration & Naturalization Serv.*, 258 F.3d 1213, 1217 (10th Cir. 2001), *cert. denied*, 534 U.S. 1071 (2001) (citing *I.N.S. v. St. Cyr*, 533 U.S. 289, 311-13 (2001)).

omitted).  Moreover, "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus." *Muhammad v. Close,* 540 U.S. 749, 750 (2004) (citation omitted).  In any event, regardless of the Attorney General's discretion regarding the detention of an individual pending removal, the Attorney General has no discretion to violate the Constitution.  *See Sierra*, 258 F.3d at 1217 (citations omitted) ("Second, § 1252(a)(2)(B)(ii) strips the courts of jurisdiction to review only matters falling within the Attorney General's discretion.  Sierra does not seek review of the Attorney General's exercise of discretion; rather, he challenges the constitutionality of the procedures used in his parole proceeding.  It is never within the Attorney General's discretion to act unconstitutionally.")[11]  However, the Court does agree with Federal Respondent that the Court does not have jurisdiction to grant class-wide injunctive relief,

---

[11]   Federal Respondent does not assert in its papers that the Court lacks jurisdiction to review constitutional challenges to mandatory detention under 8 U.S.C. § 1225, 8 U.S.C. § 1226(c), or post-removal period detention under 8 U.S.C. §1231.  The Court notes that in *Demore v. Kim*, 538 U.S. 510, 516-18 (2003), the Supreme Court held that § 1226(e) did not prevent noncitizens from raising constitutional challenges to mandatory detention under § 1226(c).  In addition, a number of courts have found that constitutional protections under the Due Process clause can outweigh statutory language under § 1225 and 1226(c).  *See*, *e.g.*, *Jennings v. Rodriguez*, 138 S. Ct. 830, 837-42 (2018) (deciding merits of habeas petition challenging indefinite mandatory detention under §§ 1225(b) and 1226(c)); *Ramsundar v. Wolf*, No. 20-CV-361, 2020 WL 1809677, at *5 n.4 (W.D.N.Y. Apr. 9, 2020) (collecting cases).  Further, "§ 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."  *Zadvydas*, 533 U.S. at 688; *see also Ali v. Dep't of Homeland Sec.*, No. 4:20-CV-0140, 2020 WL 1666074, at *2 (S.D. Tex. Apr. 2, 2020) ("As an initial matter, the Government argues that the Court has no jurisdiction in this case.  However, the Supreme Court has clearly found jurisdiction under the federal habeas statute 28 U.S.C. § 2241 in challenges to post-final-order-of-removal detention.") (citing *Clark v. Martinez*, 543 U.S. 371, 386-87 (2005)) (citation omitted).

as 8 U.S.C. § 1252(f)(1) unambiguously precludes this Court from granting class-wide

injunctive relief that would effectively restrain operation of §§ 1221-31.  This provision,

titled, "Limit on injunctive relief," states:

> Regardless of the nature of the action or claim or of the identity of the party
> or parties bringing the action, no court (other than the Supreme Court) shall
> have jurisdiction or authority to enjoin or restrain the operation of the
> provisions of [8 U.S.C. §§ 1221-1231] other than with respect to the
> application of such provision **to an individual** against whom proceedings
> under such part have been initiated.

8 U.S.C. § 1252(f)(1) (emphasis added).

Therefore, while section 1252(f)(1) does not preclude individual claims, which the

present motion addresses, it bars injunctive relief on behalf of a class.  *See Jennings v.*

*Rodriguez*, 138 S. Ct. 830, 851 (2018).

Federal Respondent also argues that the habeas proceeding embodied by the

Amended Petition is improper in this case as Petitioners are challenging the conditions of

their confinement given that their release is predicated on the conditions within SCJ in

light of COVID-19.  (Dkt. 58 at 19-20.)  The United States Supreme Court has "left open

the question whether [detainees] might be able to challenge their confinement conditions

via a petition for a writ of habeas corpus."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63

(2017); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another

day the question of the propriety of using a writ of habeas corpus to obtain review of the

conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a

prisoner is put under additional and unconstitutional restraints during his lawful custody,

it is arguable that habeas corpus will lie to remove the restraints making custody

illegal."). That said, the Eighth Circuit, in post-*Presier* decisions, addressing a split in decisions among the Circuits, has concluded that a habeas petition is not the proper claim to remedy constitutional claims relating to the conditions of confinement. *Spencer v. Haynes*, 774 F.3d 467, 470-71 (8th Cir. 2014) (citing *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996)).

*Spencer* and *Kruger* are distinguishable from the unique and unprecedented dilemma that the COVID-19 pandemic presents. Indeed, in *Spencer*, the Eighth Circuit in making its holding noted that Spencer was not "seek[ing] a remedy that would result in an earlier release from prison." 774 F.3d at 469. Instead, his Eighth Amendment challenge pertained to the use of four-point restraints on his person for an extended period of time.[12] *Id.* Under such a claim, Spencer could have arguably brought an action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), to challenge the violation. Indeed, the Eighth Circuit in *Spencer* found that the district court should have given Spencer the option of converting his habeas petition into a *Bivens* claim. *Id.* at 471. Here, however, the remedy being sought by Petitioners is release as means to protect themselves from possible death. Release is not a remedy allowed for under a civil rights action. *See Preiser*, 411 U.S. at 500.

To the extent that the conditions of confinement create a due process violation that cannot be remedied and for which death is a probability, this Court finds that it has the

---

[12]    In *Kruger* the claimant filed a petition of habeas corpus in federal district court on the ground that by taking his blood sample, his constitutional rights had been violated. *See Kruger*, 77 F.3d at 1073.

subject matter jurisdiction to entertain a habeas petition under Section 2241 for the release of Petitioners. This is consistent with the plain language of Section 2241, which provides that writ of habeas corpus under Section 2241 shall not extend to an individual unless "[h]e **is in custody in violation of the Constitution** or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3) (emphasis added); *see also Muhammad*, 540 U.S. at 750 ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus . . . .") (citation omitted); *Awshana v. Adducci*, No. 20-10699, --- F. Supp. 3d. ----, 2020 WL 1808906, at *2 (E.D. Mich. Apr. 9, 2020) ("The petitioners here, however, are not seeking to change the conditions of their confinement or to obtain damages for past constitutional violations. Instead, they describe the close living conditions typical of custodial confinement, they recount the current commands for social distancing necessary to inhibit the spread of the novel coronavirus, and they argue that no custodial condition will protect them from infection . . . . That form of relief falls squarely within the prevue of section 2241."); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) (noting that the Sixth Circuit does not allow habeas petition pertaining to conditions of confinement, and finding "[o]n its face, the application appears to concern Petitioner's conditions of confinement. Petitioner titles her claim for relief: 'Freedom from Cruel Treatment and Conditions of Confinement.' But Petitioner may nonetheless bring her claim under 28 U.S.C. § 2241 because she seeks immediate release from confinement as a result of there being no conditions of confinement sufficient to prevent irreparable constitutional injury under the facts of her case.").

For all of these reasons, the Court finds that it has the requisite jurisdiction to consider Petitioners' habeas petition for injunctive relief as it relates to their individual release from SCJ in light of COVID-19.

**B.    Motion for TRO or Preliminary Injunction**

Federal Rule of Civil Procedure 65 authorizes a district court to grant injunctive relief in the form of either a TRO or a preliminary injunction.  To determine if a party is entitled to a TRO, a court considers: (1) the likelihood of success on the merits of the claimant's claims; (2) the threat of irreparable harm to claimant; (3) the balance between that threat of harm and the injury that granting injunctive relief would inflict on other interested parties; and (4) whether the issuance of a TRO is in the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  The same factors are considered for a motion for preliminary injunctive relief.  *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 709 (8th Cir. 1989); *Jackson v. Nat'l Football League*, 802 F. Supp. 226, 229 (D. Minn. 1992).  "When a defendant has received notice and had an opportunity to respond to a motion for a TRO, the motion will be construed as one for a preliminary injunction." *Stabnow v. Lourey*, No. 19-CV-1664 (NEB/HB), 2019 WL 5150155, at *1 (D. Minn. July 23, 2019), *R.&R. adopted sub nom.* 2019 WL 4201071 (D. Minn. Sept. 5, 2019) (citing *Carlson v. City of Duluth*, 958 F. Supp. 2d 1040, 1052 n.1 (D. Minn. 2013)).

No single factor is determinative, and all factors must be viewed in totality when a court decides if relief should be granted.  *Dataphase Sys.*, 640 F.2d at 113.  Because "a preliminary injunction is an extraordinary and drastic remedy, one [ ] should not be

granted unless the movant, by a clear showing, carries the burden of persuasion."

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and emphasis omitted); *Mgmt.*

*Registry, Inc. v. A.W. Co., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) ("The party seeking

injunctive relief bears the burden of proving these factors weigh in its favor.") (quotation

marks and citation omitted).

## III.   <u>ANALYSIS</u>

### A.   **Irreparable Harm**

"The threshold inquiry is whether the movant has shown the threat of irreparable

injury." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). If "a court

determines that the movant has failed to show irreparable harm absent an injunction, the

inquiry is finished and the denial of the injunctive request is warranted." *Id.* at 420

(citations omitted). "The failure to demonstrate irreparable harm is an independently

sufficient ground to deny injunctive relief." *Jackson v. Macalester Coll.*, 169 F. Supp.

3d. 918, 921 (D. Minn. 2016) (citing *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.

2003)). This is because "'[t]he basis of injunctive relief in the federal courts has always

been irreparable harm and inadequacy of legal remedies.'" *Gelco Corp.*, 811 F.2d at 418

(quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)) (internal quotation marks and

citations omitted).

"The harm must be likely in the absence of an injunction, great, and of such

imminence that there is a clear and present need for equitable relief." *Cambria Co. LLC*

*v. Schumann*, No. 19-CV-3145 (NEB/TNL), 2020 WL 373599, at *7 (D. Minn. Jan. 23,

2020) (quoting *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d

1037, 1055 (D. Minn. 2019)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.").  A claimant "must show more than a future risk of irreparable harm; 'there must be a clear showing of immediate irreparable injury.'"  *Cambria*, 2020 WL 373599, at *7 (quoting *Berkley Risk Admins. Co., LLC v. Accident Fund Holdings, Inc.*, No. 16-CV-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016)) (cleaned up); *see also Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996) ("In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.").  "Possible or speculative harm is not sufficient."  *Anytime Fitness, Inc. v. Family Fitness of Royal*, LLC, No. 09-cv-3503 (DSD/JSM), 2010 WL 145259, at *2 (D. Minn. Jan. 8, 2010) (citing *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am. v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir.1995)).  Indeed, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

Petitioners assert that they have met the irreparable harm element, especially as to those in the high-risk group, given the harm that COVID-19 poses, and the fact that it

will ultimately be detected within the SCJ.[13]  (Dkt. 45 at 38.)  There is no dispute that

there have been no confirmed cases of COVID-19 within the SCJ.  This alone reduces the

imminence of Petitioners' claims of irreparable harm, especially considering the

measures put in place by Respondents, regardless of the Petitioners' possible

susceptibility to the disease.  *See Brown v. United States Dep't, of Homeland Sec.*, No.

3:20-CV-0119, 2020 WL 1911506, at *8 (M.D. Pa. Apr. 20, 2020) ("While, the Court

acknowledges Brown's susceptibility to complications should he contract COVID-19, the

Court, again, notes that Brown is housed in a facility with no confirmed cases of COVID-

19.  Thus, that alone, reduces the imminence of Brown's claim.").  Further, the Court

cannot disregard the extensive cleaning, sanitation, and social distancing procedures

implemented by SCJ to minimize the risks relating to COVID-19.  *See Albino-Martinez*

*v. Adducci*, No. 2:20-CV-10893, 2020 WL 1872362, at *4 (E.D. Mich. Apr. 14, 2020)

("And, although there are confirmed COVID-19 cases in St. Clair detention facility, there

is no evidence that Respondents and facility officials are not doing everything possible to

prevent the spread of COVID-19 and to keep detainees safe.  Both the Monroe and the St.

Clair detention facilities have instituted policies specifically designed to combat COVID-

19 and care for detainees.  Petitioners therefore failed to meet their burden to demonstrate

---

[13]    Due to the nature of the Amended Petition and this expedited Motion, evidence of
each Petitioner's health is fairly limited.  It is possible that an individual Petitioner may
be able to present additional evidence of his specific health concerns and how they fit
within the CDC's recommended actions for high-risk persons.  *See* Ctrs. for Disease
Control & Prevention, *Groups at Higher Risk for Severe Illness* (last visited Apr. 27,
2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-
higher-risk.html.

that they would face an immediate and irreparable injury absent the Court granting their motion.") (internal citations omitted).

In addition, at this stage in the proceedings, Petitioners have not provided the Court with any proposed release plan demonstrating that they will isolate or that they will be safer if they do have residence in which to isolate.[14]  There is no dispute that "[e]very person in the United States, whether in a detention facility or not, faces COVID-19 exposure."  *Albino-Martinez*, 2020 WL 1872362, at *4.  Therefore, Petitioners have failed to show they are more likely than not to suffer imminent and irreparable harm if they remain in detention.  *See Brown*, 2020 WL 1911506, at *8.

For all of the reasons stated forth above, Petitioners have failed to meet their burden to show an irreparable harm.[15]

## B.     Likelihood of Success on the Merits

While no single *Dataphase* factor is determinative, "[s]uccess on the merits has been referred to as the most important of the four factors."  *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (citation omitted); *see also Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005) ("[A]n injunction cannot issue if there is no chance of success on the merits.") (citations omitted).  "In considering

---

[14]     The Court acknowledges that the large number of Petitioners and short time frame for Petitioners' Motion may have affected Petitioners' ability to present a concrete release plan at this time.

[15]     The Court also notes that to the extent that a Petitioner has been removed from the SCJ, there is no arguable basis for irreparable harm and the request for injunctive relief appears to be moot.  *See Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005).

the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143 (8th Cir. 2007) (citation omitted). Instead, this factor simply requires a movant to show that he has a "fair chance of prevailing" on its claims. *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).

As set forth above, Petitioners' habeas petition and motion for injunctive relief raises two separate grounds for habeas relief. First, they argue Respondents have violated their substantive due process rights by demonstrating deliberate indifference to their serious medical needs and safety given the COVID-19 pandemic. Second, Petitioners argue the conditions of their confinement in light of the dangers of COVID-19 amounts to unlawful punishment in violation of due process. Petitioners agreed at the hearing that their due process claim based on deliberate indifference to their serious medical needs and safety and due process claim based on unlawful punishment fundamentally come down to the same deliberate indifference standard, and thus rise or fall together.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) (citation omitted). This "affirmative duty to protect" arises by the limitation the state has imposed on a person's freedom to act on his own behalf. *Id.* at 200. As immigration detainees, Petitioners' status is similar to the status of pretrial detainees. *See Ukofia v. Dep't of Homeland Sec.*, No. CIV. 09-

0017PJS/JJG, 2010 WL 597059, at *6 (D. Minn. Feb. 17, 2010) (citations omitted) ("The status of an immigration detainee is similar to the status of a pretrial detainee."); *see also Alejandra*, 2020 WL 1703844, at *6.  In addition, detainees "may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Bell*, 441 U.S. at 535 (citations omitted); *see also Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982) (finding that individuals who have been civilly detained or committed "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish").  That said, "not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense."  *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996) (citation omitted).

The Eighth Circuit has held that "deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety."[16] *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006).  Similarly, the Eighth Circuit in *Butler* concluded that the deliberate indifference test, not the freedom from punishment

---

[16]    The Court notes that while the Amended Petition is technically not analyzed under the Eighth Amendment, but under the Due Process Clause, there is no practical difference in the analysis since pretrial detainees are entitled to the same protection under the Fifth and Fourteenth Amendments as imprisoned convicts receive under the Eighth Amendment.  *See City of Revere*, 463 U.S. 239, 244 (1983); *Butler*, 465 F.3d at 345; *Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003); *Davis v. Hall*, 992 F.2d 151, 152-53 (8th Cir. 1993) (identifying standard for Eighth Amendment claim of deliberate indifference, then applying it under the Fourteenth Amendment to claim by pretrial detainee).

test, applies to a claim challenging the adequacy of precautionary measures to reduce the risk of infection:[17] "The governmental duty to protect at issue in this case is not based on a pretrial detainee's right to be free from punishment but is grounded in principles of safety and general well-being."  465 F.3d at 344.[18]

"To show deliberate indifference, the prisoner/detainee must prove both that the official's acts objectively caused a sufficiently serious deprivation and that the official had a subjectively culpable state of mind." *Perkins v. Grimes*, 161 F.3d 1127, 1130 (8th Cir. 1998) (citation omitted); *see also Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *9 (D. Md. Apr. 3, 2020) (applying this criteria to analysis of immigration detainee with respect to a deliberate indifference claim in the COVID-19 context).  The objective prong requires that Petitioners show that they suffered from an objectively serious medical need.  *See Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016).  With respect to the objective factor, Petitioners must show that they themselves individually are being exposed to an unreasonably dangerous situation where it is likely they will contract the COVID-19 and are at risk for serious complications as it relates to

---

[17]     Both parties concede that the deliberate indifference test also applies to Petitioners' unlawful punishment claims.

[18]     Petitioners' reliance on *Rafael L.O. v. Tsoukaris*, Civil Action No. 20-3481 (JMV), 2020 WL 1808843 (D.N.J. April 9, 2020), and related cases (Dkt. 45 at 44-45; Dkt. 68 at 17), ignores the fact that such cases use a different test, looking at whether a condition of confinement is reasonably related to a legitimate governmental objective, *e.g.*, *Rafeal L.O.*, 2020 WL 1808843 at *7, as opposed to  the deliberate indifference test used under Eighth Circuit jurisprudence for the purposes of evaluating an unlawful punishment claim with respect to the health and safety of pretrial detainees, *see Butler*, 465 F.3d at 344-45.

the infection, and need to produce "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood [of] injury." *See Helling v. McKinney*, 509 U.S. 25, 36 (1993); *see also Malam*, 2020 WL 1672662, at *11 ("The objective component is satisfied by showing that, absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm.") (quotation marks and citation omitted). Such showing can be made through medical evidence or is so obvious that a lay person would recognize the danger. *See Saylor*, 812 F.3d at 644. With respect to the objective prong, the available evidence establishes that COVID-19 is a highly communicable disease that presents a potentially mortal risk, particularly for high-risk individuals such as those Petitioners with risk factors identified by the CDC. Federal Respondent conceded at the hearing that it was not taking the position that that the COVID-19 pandemic does not pose a serious risk to the Petitioners.[19] Although Federal

---

[19]   As one court has recently summarized, a substantial risk of harm also applies to individuals that do not fall into one of the CDC risk groups:

> Consider recent data from the CDC. In a sample of COVID-19 patients aged 19 and older with no underlying health conditions or risk factors, approximately 7.2-7.8% were hospitalized without requiring admission to the Intensive Care Unit ("ICU"), and an additional 2.2-2.4% were hospitalized in the ICU, totaling 9.6-10.4%. If the pool is restricted to patients between the ages of 19 and 64, all with no underlying health conditions reported, approximately 6.2-6.7% were hospitalized without admission to the ICU, and an additional 1.8-2.0% required the ICU, for a total hospitalization rate of 8-8.7%. The rates of hospitalization and ICU admittance are significantly higher for those with underlying health conditions. Since COVID-19 is highly contagious and the quarters are close, the Detainees' chances of infection are great. Once infected, taking hospitalization as a marker of "serious harm," it is apparent that even the

Respondent intimates that potential risk is insufficient to meet the objective prong, presumably because there has been no <u>confirmed</u> case of COVID-19 within the SCJ, any such argument lacks merit because as "a remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33-34; *Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995) (finding that a government actor can violate the Constitution "by being deliberately indifferent either to a prisoner's existing serious medical needs or to conditions posing a substantial risk of serious future harm"). Further, as Federal Respondent conceded at the hearing, the absence of a confirmed case of COVID-19 does not mean that there is no COVID-19 within SCJ.

As it relates to the subjective prong, a "prisoner/detainee must prove that the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that the official drew that inference." *Perkins*, 161 F.3d at 1130 (citation omitted). "The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of more than gross negligence," requiring a "mental state akin to criminal recklessness." *Saylor*, 812 F.3d at 644 (citations and quotations omitted); *see also Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) (citations and quotations omitted) ("To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish

---

young and otherwise healthy detainees face a "substantial risk" (between five and ten percent) of such harm.

*Savino v. Souza*, No. CV 20-10617-WGY, 2020 WL 1703844, at *7 (D. Mass. Apr. 8, 2020).

a mental state akin to criminal recklessness: disregarding a known risk to the arrestee's health.") (cleaned up).  Moreover, deliberate indifference must be more than simply a disagreement regarding medical judgment or with treatment decisions.  *See Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006) (citing *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).  Indeed, where "proscriptive action designed to alleviate the medical need has been provided and the dispute is over the adequacy of the treatment or preventative steps taken, federal courts 'are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'"  *Jorge V.S. v. Green.*, No. CV 20-3675 (SDW), 2020 WL 1921936, at *3 (D.N.J. Apr. 21, 2020) (quoting *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013), quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).  Further, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

While the medical conditions of the Petitioners are relevant, the fact that a detainee falls into one of the CDC's risk groups does not amount to a *de facto* constitutional violation by Respondents for failure to release such a detainee.  Even assuming the risk to those detainees with medical conditions renders them more susceptible to serious COVID-19 infections, under CDC and ICE guidance, Respondents have taken numerous measures in order to prevent the spread of COVID-19 in the Alpha unit at the SCJ, and thereby reduce the likelihood that the detainees, including those at higher risk, become infected by the virus.

In this case, both Respondents have acknowledged the risk of spread of COVID-19 in SCJ.  In accepting this risk, Respondents have worked together to put in place numerous procedures meant to prevent the introduction of COVID-19 at the SCJ and its spread to Petitioners in the Alpha unit.  County Respondent has taken aggressive measures to decrease the risk of the introduction of the virus into the SCJ based on its quarantine procedures for new inmates/detainees and its staffing procedures.  Further, County Respondent has taken steps to prevent the spread of the virus within the SCJ. This includes increasing the renewal of the SCJ's air with fresh air from 20% to between 80% and 100% and filtering the return air; frequent sanitization; giving Petitioners access to no cost hand-washing both in the dayroom and their respective cells; and providing Petitioners and staff with masks.

In addition, while there is no dispute that some of the detainees, similar to some members of the public, have chosen not to socially isolate, the available record is replete with measures taken by County Respondent, following guidance provided by the CDC and Federal Respondent, to give Petitioners the ability to socially distance as recommended by the CDC if they so choose.  This includes, but is not limited to, providing Petitioners with ample spacing in the dayroom, instructing COs to ensure the detainees can socially distance if they so choose, giving Petitioners the ability to stay in their respective single-bunked cell even during time free time in the dayroom, eating lunch in one's cell, and the recent spacing in the medication line.  *Compare*, *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) (finding a likelihood on the success of the merits with respect to deliberate indifference

where the "[r]espondents could not represent that the detention facilities were in a position to allow inmates to remain six feet apart from one another, as recommended by the Centers for Disease Control and Prevention").

Petitioners and their experts acknowledge these measures, but focus on the fact that despite "[a]ll of the measures that the SCJ has implemented cannot reasonably assure that COVID-19 will not get into the facility" through its staff or cleaning people given the disease's asymptomatic nature, and cannot prevent its spread "[b]ecause social distancing within Alpha unit cannot be reasonably assured despite all of SCJ's effort to encourage social distancing notwithstanding," making the only "reasonable" measure that has a greater likelihood of keeping Petitioners safe is their release. (Dkt. 89 at 2-5; *see also* Dkt. 45 at 40-41.) However, for the purposes of finding a likelihood of success as to deliberate indifference, the Court cannot find based on this record that Respondents' conduct is akin to criminal recklessness for refusing to release them simply because Respondents cannot guarantee that the infection will not enter or spread within the SCJ. *See Brown*, 2020 WL 1911506, at *7-8 (finding that although petitioner had medical conditions placing him at serious risk of COVID-19, the measures taken by respondent, which were less than the Respondents in this case, "do not demonstrate that prison officials have recklessly disregarded the substantial risk of harm that COVID-19 poses. Rather, these actions indicate that Respondent is actively taking significant steps to try and prevent detainees from contracting COVID-19. While there may not yet be a perfect solution to preventing the spread of this infectious disease, Respondent's conduct simply does not demonstrate a deliberate indifference to the current global pandemic."). Indeed,

Petitioners cannot guarantee that they will not contract the disease should they be released. *See Hassoun v. Searls*, No. 1:19-CV-00370 EAW, ---F. Supp. 3d ----, 2020 WL 1819670, at \*7 (W.D.N.Y. Apr. 10, 2020) ("The fact that Respondent has not been able to eliminate the risk entirely does not establish deliberate indifference—to the contrary, despite unprecedented efforts by all levels of government, the public as a whole remains at risk of contracting COVID-19.").

Moreover, Petitioners' position that Respondents are acting with deliberate indifference, despite all of their attempts and procedures put in place to keep the virus out of the SCJ and to prevent its spread within the Alpha unit, because the best way to prevent them from contracting the virus is their release, is contrary to the Eighth Circuit's decision in *Butler* dealing with the spread of tuberculous[20], another airborne communicable disease, to detainees:

> In this case, Butler challenged health care policies adopted and implemented by the County. Those policies did not disregard the risk of tuberculosis infection at ADC. To the contrary, as the district court noted, the policies specifically acknowledged the risk and promulgated detailed procedures for the diagnosis, segregation, and treatment of ADC inmates infected with active cases of TB. Butler asserted—with virtually no supporting evidence— that the above-described initial screening procedures were not implemented at ADC. Even if true, that would be evidence that certain ADC staff negligently, or even deliberately, failed to implement lawful policies. It is not evidence that the policies themselves were unconstitutional. Thus, the district court properly dismissed this official capacity claim because the

---

[20]    "TB bacteria are spread through the air from one person to another. The TB bacteria are put into the air when a person with TB disease of the lungs or throat coughs, speaks, or sings. People nearby may breathe in these bacteria and become infected." CDC, *How TB Spreads*, (lasted visited April 27, 2020), https://www.cdc.gov/tb/ topic/basics/howtbspreads.htm. The Court recognizes that there are differences in the manner in which and extent to which TB and COVID-19 spread; nevertheless, *Butler* sets forth the law this Court is required to apply.

undisputed evidence demonstrated that the County implemented policies addressing the serious health risk that TB poses to ADC detainees. Sheriff Fletcher did not act with deliberate indifference to this risk of harm, **whether or not he might arguably have taken other "reasonable measures to abate it**."

*Butler*, 465 F.3d at 345-46 (emphasis added). Petitioners have offered medical evidence to the effect that SCJ's measures will ultimately prove unsuccessful at preventing COVID-19 from entering or spreading within SCJ, and that the high-risk Petitioners would be far safer if removed from SCJ and allowed to shelter in place at their homes. (*See, e.g.*, Dkt. 69-4.) The Court recognizes that Respondents' measures may indeed prove inadequate to prevent COVID-19 from entering or spreading with in SCJ, and that in fact there may not be a perfect solution to prevent COVID-19 from doing so. But the Constitution does not mandate a perfect solution to avoid a deliberate indifference claim. In other words, the significant steps Respondents have taken to prevent the introduction and spread of COVID-19 do not amount to deliberate indifference merely because Respondents will not take the alternative measure of releasing the Petitioners, especially where there is no indication that COVID-19 is presently within the facility or that Petitioners will not nevertheless contract the disease outside the facility.[21] *See Leandro R. P., v. Decker*, 2020 WL 1899791, at *8 (D.N.J. Apr. 17, 2020) ("[A]ctions indicate that Respondents are actively taking significant steps to try and prevent detainees from contracting COVID-19. While there may not yet be a perfect solution to preventing the

---

[21]    Should conditions within the SCJ change, including the discovery of a confirmed case of COVID-19, the Court expects the SCJ would immediately make counsel for Petitioners and the Court aware of the changed circumstances.

spread of this infectious disease, Respondents['] conduct simply does not demonstrate a deliberate indifference to the current global pandemic."); *Verma v. Doll*, No. 4:20-CV-14, 2020 WL 1814149, at *6 (M.D. Pa. Apr. 9, 2020) ("There is no perfect solution to preventing the spread of COVID-19 in detention facilities, but York County Prison officials have taken reasonable steps to limit the spread throughout its facility.  Verma has not established a conscious disregard for the risk posed by COVID-19.  Respondent's conduct does not constitute deliberate indifference.") (internal citation omitted); *Sacal-Micha v. Longoria*, 1:20-CV-37, ---F. Supp. 3d----, 2020 WL 1518861, at *5-6 (S.D. Tex. Mar. 27, 2020) (dealing with vulnerable individual based on medical conditions and age and finding that "the record reflects that ICE has provided constant medical attention . . . and has implemented preventative measures to reduce the risk of Sacal contracting COVID-19.  Those measures may ultimately prove insufficient.  But the implementation of those measures preclude a finding that ICE has refused to care for Sacal or otherwise exhibited wanton disregard for his serious medical needs.  In other words, Sacal has not demonstrated that the conditions in which ICE maintains him in custody arise to the level of a constitutional violation" and concluding that "the fact that ICE may be unable to implement the measures that would be required to fully guarantee Sacal's safety does not amount to a violation of his constitutional rights and does not warrant his release."); *see generally*, *United States v. Graham*, No. 19-CR-1852 (SRN-KMM), 2020 WL 1685912,

at *6 (D. Minn. Apr. 7, 2020)[22] (citations omitted) (dealing with the SCJ and finding that because there was "no evidence that the Jail is unable to effectively monitor or treat him should he contract COVID-19, along with a lack of evidence showing that Graham is at higher risk of contracting COVID-19 in general, or a higher risk while in custody than if he were released, the Court finds no evidence of deliberate indifference to his medical needs in violation of the Eighth Amendment").

In sum, on this record, Petitioners have not demonstrated sufficient likelihood of success in proving that Respondents have acted with deliberate indifference to their medical care and reasonable safety or engaged in unlawful punishment for the purposes of their due process claims.

## C.   Balance of Harms and Public Interest

When a party seeks preliminary injunctive relief against the government, the balance of the equities and the public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting, in the context of a plaintiff's suit seeking a stay of removal proceedings, that the balance of equities and public interest "factors merge when the Government is the opposing party"). In the detention setting, a request for a preliminary

---

[22]   The Court acknowledges Petitioners' reliance on U.S. Magistrate Judge Katherine M. Menendez's Order in *United States v. Ramirez-Rodriguez*, 20-CR-28-JRT-KMM (April 14, 2020 (Dkt. 42)), where the Magistrate Judge temporarily released an individual with diabetes from the SCJ under the Bail Reform Act. However, *Ramirez-Rodriguez* is distinguishable from the present case, in part because of the defendant's robust release plan in *Ramirez-Rodriguez*, and more importantly because Magistrate Judge Menendez's analysis in *Ramirez-Rodriguez* was the under the Bail Reform Act, 18 U.S.C 3142(i), as opposed to the deliberate indifference standard here as it applies to Petitioners' due process claims.

injunction "must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (internal quotation marks omitted).

The public interest in enforcement of United States immigration laws is significant. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *see also Nken*, 556 U.S. at 436 ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permit[s] and prolong[s] a continuing violation of United States law.") (internal marks omitted)).  However, "the determination of where the public interest lies also is dependent on the determination of the likelihood of success on the merits of the [constitutional] challenge because it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) (en banc).

In addition, although Petitioners have a legitimate concern regarding their health resulting from the threat of COVID-19, as set forth with respect to the irreparable harm, it is not clear to the Court based on the existing record that Petitioners will be able to effectively isolate if released, or deal with their existing medical health issues, including mental health issues. *See Lopez-Marroquin v. Barr*, No. 20CV682-LAB (MDD), 2020 WL 1905341, at *6 (S.D. Cal. Apr. 17, 2020) ("Petitioner even acknowledges that doctors have told him he needs medication, but he does not understand the purpose and

impact of his medication, and he cannot reliably administer his own mental health care. Therefore, unlike in other cases where courts have found that a petitioner would be better able to protect themselves from COVID-19 in their own homes, the Court finds that Petitioner's health would be better protected in detention than outside of it.") (internal citations omitted).

Because this Court has determined that Petitioners are unlikely to succeed on the merits with respect to their constitutional claims, coupled with the other policy considerations discussed above with respect to deferring to prison officials in matters of prison administration, immigration enforcement, the health of Petitioners, and the health of the public, this Court finds based on the available record that the public interest and the balance of harms would not be served by granting Petitioners' Motion. This factor, therefore, also weighs against entry of a preliminary injunction.

* * *

Having considered the *Dataphase* factors, the Court finds they weigh against granting a TRO or preliminary injunction, and therefore recommends denial of the Motion. That said, the Court shares Petitioners' concerns regarding the risk that COVID-19 presents to them during their detention at SCJ. The Court recognizes that what is known and understood about the COVID-19 pandemic, as well as the conditions within SCJ, is constantly evolving, and that there may be subsequent facts established as to those conditions and an individual Petitioner's health and proposed release plan that could tip the balance differently. For those reasons, the Court recommends denying the Motion without prejudice.

## IV.   <u>RECOMMENDATION</u>

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**RECOMMENDED** that the Motion for Temporary Restraining Order or Preliminary

Injunction (Dkt. 43) be **DENIED without prejudice**.


DATED: April 28, 2020                    <u>*s/ Elizabeth Cowan Wright*</u>
                                          ELIZABETH COWAN WRIGHT
                                          United States Magistrate Judge

### <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Consistent with District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations on or before **May 1, 2020**. A party may respond to those objections on or before **May 4, 2020**.[23] D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).

---

[23]     If any party seeks additional time for objections or responses, they may request additional time from the Court.